### BOUCHER et al. v. WISSMAN.
#### No. 14238.

Court of Civil Appeals of Texas. Dallas.
July 14, 1950.

On Appellants' Remittitur Aug. 22, 1950.

Rehearing Denied Oct. 6, 1950.

J. Willard Gragg and Charles H. Storey, both of Dallas, for appellants.

Henry Klepak and John P. Koons, both of Dallas, for appellee.

BOND, Chief Justice.

This is an appeal from final judgment of a District Court of Dallas County permanently enjoining appellants-defendants from manufacturing and selling a fishing pole, on the theory that the assemblage and creative idea belonged to appellee-plaintiff, and which the appellants contracted and agreed not to manufacture and sell to anyone other than appellee; and from an award of $4,420 in favor of appellee against appellants for breach of the contract as hereinafter stated; also from denying to appellants in cross-action a judgment against appellee and his sureties on his temporary injunction bond for preventing appellants, during the period of such injunction, from manufacturing and selling such fishing pole, or one confusingly similar thereto. The parties will be here designated as in the court below.

On trial to a jury on special issues the jury found, in effect: (1) That defendants agreed not to manufacture and sell plaintiff's fishing pole to anyone other than the plaintiff; (2) defendants engaged in "unfair competition" in that they manufactured and sold plaintiff's fishing pole, or similar fishing poles, to other persons, firms and corporations; (3) that plaintiff suffered damage by reason of defendants' engaging in "unfair competition," as defined by the court's charge, in that "they manufactured and sold and attempted to pass or sell fishing poles as the goods or business of the plaintiff"; (4) that $4,420 was a reasonable sum to compensate plaintiff for a breach of the contract; (5) that the contract or agreement was not made in consideration of plaintiff's buying the fishing poles exclusively from defendants; (6) that except for the temporary injunction issued on June 13, 1947, the defendants would have continued in the business of manufacturing and selling the fishing poles during the time the temporary injunction was in force, namely, from June 23, 1947 until January 21, 1948; (7) that defendants would have earned the sum of $15,000 net profit from the manufacture and sale of the fishing poles that they would have manufactured, but for the injunction, during the period of the restraining order.

On the verdict of the jury, the trial court rendered the judgment from which this appeal is prosecuted.

In due time the defendants duly excepted to the action of the court in submitting plaintiff's purported affirmative issues; objected in severalty to such issues as having no support in pleadings and evidence, not determinative of any fact on which the court could entertain the injunction or judgment in favor of the plaintiff, or that defendants were guilty of "unfair competition" and that such issues assumed and presumed "unfair competition," and breach of contract in "passing or attempting to pass off upon the public goods or business of one person as the goods or business of another," as the term "unfair competition" is defined in the court's charge. Appropriate assignments were duly brought forward in motion for new trial, and, in addition, defendants urged judgment in their favor on their cross-action for damages against the plaintiff and his bondsmen in the sum of $15,000 as found by the jury. To the action of the trial court adverse to defendants' motion, defendants present appropriate points of error in this appeal.

In a former appeal from the action of the trial court in granting the temporary injunction restraining the defendants from making, manufacturing, and selling the fishing poles in question, as being plaintiff's creative idea and assembly,—a "trade secret," our opinion fully states the factual background pertinent to the injunctive feature of this suit, 206 S.W.2d 101, writ refused, n.r.e. The facts there stated are substantially reflected in the record here. In that opinion we held, in effect, that plaintiff had no "trade secret" in the assembly of the common parts that formed the fishing pole, and that in manufacturing and selling such pole, or one similar in construction, the defendants betrayed no confidential business secret and engaged in no unfair competition to the plaintiff as could be restrained by injunction or otherwise. Hence we reversed the judgment of

the trial court and immediately dissolved the temporary injunction. Subsequent to that decision, on trial to the merits (from which this second appeal is taken), the plaintiff in amended petition reasserts his claim of a prior "trade secret," claiming to be the first to originate the idea of the fishing pole assemblage; that the defendants infringed upon that right by manufacturing and selling a fishing pole confusingly similar thereto; and (not alleged in his prior pleadings on the trial for temporary injunction) plaintiff asserts that a contractual fiduciary relationship existed between himself and the defendants by which he entrusted to them the secret information concerning his constructive idea and assemblage; and in so doing secured a pledge or agreement of secrecy from the defendants concerning his design, style, and creation of the fishing pole; and, in pursuance thereto, defendants were, legally, and in good faith, obligated not to manufacture and sell the fishing pole to anyone other than to the plaintiff.

 It will be seen from the record that plaintiff's suit involves no patent rights. He has no patent to legally protect his alleged inventive assemblage idea, and there is no evidence presently presented on which he can base any property rights. An inventor of a novel, useful device or article, has a right to protection of his invention only by himself keeping it a secret or by obtaining a protective patent from the Federal patent authorities. Since protection of a trade secret is afforded only when there has been no public disclosure, or a patent has been duly issued, or application therefor presently pending, it is therefore incompatible with contract to keep secret that which is not secret; especially so, where the principle and method of same has been publicly disclosed by the inventor and the article itself,—in thousands—on sale to the public. Manifestly, matters and articles of trade which are completely disclosed by the inventor, as in the case at bar, and by the articles themselves, are not secret after such articles have been put on the market, and viewed, bought, and sold by people generally.

 Furthermore, to constitute a new process or inventive idea by an assembly of parts creating a novel and useful product, there must be employed a meritorious discovery or inventive idea, not merely a mechanical difference in the use of common products. The assembly of various parts composing the fishing pole in question which the defendants were temporarily and permanently enjoined from manufacturing and selling, is susceptible to be copied and manufactured by anyone possessing mechanical ability of the most simple nature. Such pole consists of the assembly of a series of common tubular aluminum pipes or bars, three feet in length, joined together by slip or tapering joints, or screw joints; the first, or butt joint, being large enough to be used as a "container" for the other two joints; and, when placed in the container, with rubber tip at the end, may be used as a "walking stick." In brief, the pole assemblage is what is commonly known in fishermen's parlance as a jointed fishing pole, fly rod, and casting rod. Useful, indeed, for disciples of Izaak Walton. And the container, as a "walking stick," may be a novel fabricated idea for the lame and limp pedestrian, whether he be a fisherman or otherwise; but it could hardly be said to be such an invention or discovery as could be patented, or protected as a trade secret by injunction or otherwise.

In the case of Brown & Root, Inc., v. Jaques, Tex.Civ.App., 98 S.W.2d 257, the inventor assembled a portable, horizontal, circular saw. After some negotiation with the defendant in the suit, the inventor took one of his saws to a timber area for demonstration, for the specific purpose of furnishing a number of saws to the defendant, if the saw proved acceptable. A disagreement arose as to the price, resulting in the defendant's refusing to purchase the new and novel wood saw, and in defendant's constructing a similar saw. There was a contract entered into by the parties whereby the defendant was to protect the inventor in his contrivance, or invention. The suit was grounded upon alleged fraud of appellant in securing, through bad faith, treach-

ery, and misrepresentation, the secret principles of plaintiff's invention which plaintiff had theretofore kept concealed from the public, and which secret appellant thereupon sought to appropriate to its own use and benefit. The Austin Court of Civil Appeals held that the saw "was not such a device as would conceal the secret of its construction; on the contrary, when exposed to the public it readily revealed the arrangement or combination of well known mechanical parts by which it was constructed and operated."

The findings of the jury shown here, were, in brief, that plaintiff's damage was the result of a breach of contract by defendants in manufacturing and selling plaintiff's fishing pole and "walking stick" to others rather than to the plaintiff; and the trial court in consonance with the findings entered the judgment for plaintiff's damage. In the disposition of this appeal, as was our conclusion in the former appeal, we are still of the opinion that the plaintiff is not entitled to the injunction to protect a "trade secret"; and certainly there is no evidence that the defendants sold or attempted to sell fishing poles as being those of plaintiff's design, or that the defendants engaged in the business or were guilty of any act that could be characterized as "unfair competition" as defined in the court's charge.

On the issue of breach of contract it will be observed that in plaintiff's original petition on file in the former appeal, which we are here privileged to refer to and consider, the plaintiff alleged in detail that he called upon the defendants in reference to the manufacture of his fishing pole, and supplied them with a sample or drawing for the purpose of determining whether or not they could manufacture the fishing pole *in production;* that he negotiated with defendants to make 31 samples for which he paid them the sum of $190; and, thereafter, the defendants being unable to properly construct a satisfactory sample, plaintiff contacted another tool manufacturer to make the fishing poles in production for public sale. As a consequence, the defendants began making and selling the fishing pole, or one similar thereto. In plaintiff's amended petition, on trial to the merits, his cause of action is alleged substantially as in his original petition, other than as to the alleged contract or agreement by defendants not to manufacture and sell a competitive fishing pole to the public. In legal effect there is no substantial difference between the testimony presented in this appeal and that in the former appeal.

Plaintiff testified that he contacted the defendants in reference to making the fishing poles *in production;* that he exhibited to them a sample and drawing of his fishing pole which had previously been made by another die and tool company; and that in the course of their dealing he gave the defendants an order to make like samples. He was then asked: "Q. What did you do after that in reference to those poles?" To which plaintiff testified that he called upon another firm, Smallwood & Company, and had Mr. Smallwood make up the poles in production quantities. He was then asked: "Q. State whether or not any conversation was had between you and the defendants with reference to their manufacture of the poles themselves?" To which plaintiff testified that in their discussion the defendants agreed to manufacture that pole for him at a price which they would quote; they agreed that no one else was to have it and that they would keep it a secret; that it was his exclusive property and that they would make the poles for him. The plaintiff was further asked: "Q. What were the words about the secret?" To which he answered: "I said, 'It's my exclusive idea and you will make it for me' and they said 'Yes, we are known to make things and we don't reveal anything. We don't sell anything ourselves; anything that a customer gives us and we will make same for you in production for your exclusive purpose' * * *. Q. Will you tell the jury exactly what your conversation was with Mr. Boucher and Mr. Phillips in reference to the manufacture of that pole, whether they could manufacture and sell it? A. My conversation with them was if we make a deal, if we reach an agreement for them to manufacture this pole, after I had showed them my pole, that that pole was to be made exclusively for me, and if we didn't make a deal they would forget about it, and they

told me 'That is the way we do business; if we don't do the job for you we will just forget about it.'"

The defendants' version of the agreement was given in testimony by Mr. Boucher, substantially as that related by the plaintiff, along with other uncontroverted facts. Mr. Boucher testified: "Q. What was the nature of the discussion you had with Mr. Wissman, please, sir? A. After we discussed the ideas we had for the pole, the addition of a reel seat and the ideas we had in our minds for some time, and had been building, Mr. Wissman asked if we could produce him a sample, which we did, and we later made two more samples, * * *. At that time * * * we had entered into an agreement * * * whereby he would buy ten thousand fishing poles on the first order. He said he could sell two hundred thousand of those that season, and we asked Mr. Wissman to put up some money to cover the cost of the materials and tubing which he agreed to put up $4,000 and we shook hands on that deal at a set price with Mr. Wissman to furnish some tubing, which could be purchased much cheaper than the market value of tubing of that day, because it was surplus tubing of airplanes, * * * and we went back to our plant and was waiting for this order to be put in effect by the $4,000. Well, four or five weeks progressed with nothing but conversation and telephone calls, and Mr. Wissman said he had to have more samples. We set up then to make twelve samples more for him and the twelve samples were made. Then out of the twelve we delivered eleven. One was defective and we delivered eleven to him. These eleven samples were probably delivered along in March. At that time Mr. Wissman was wanting lesser poles, or smaller quantity of poles at the same price, and not have to put up so much money. Well, it drug on for two or three weeks more, and at that time we were waiting for Mr. Wissman to do something; we were holding back our machine tools and so forth to put in production on this item, and we had several telephone conversations asking Mr. Wissman to place it himself and come on with the deal so we could put these tools busy because they were idle and in fact there was business to be had, and we turned down other types of production work at that time. Mr. Wissman wanted a smaller amount of poles made. Well, we finally agreed to make the five thousand poles at the same price we would build the ten thousand quantity for, and also to cut in half the deposit required to $2,000, and Mr. Wissman said that would be fine and again a verbal contract was made and we went back to our plant waiving $2,000. * * *."

■ It will be observed from the record evidence, supra, that the agreement or contract between the parties, whereby defendants were to keep the matter a secret and not to manufacture and sell the poles to others, hinged on a reciprocal agreement and understanding that defendants were to manufacture fishing poles for plaintiff in production quantities for sale to the public; hence upon plaintiff's failure to accord the defendants an order to manufacture the poles in production, the contract was at an end; defendants were at liberty to manufacture and sell the fishing pole or poles similar in construction, so long as they did not attempt to palm off poles as those of the plaintiff. To hold otherwise, the contract or agreement between the parties would be unilateral—a nudum pactum—since the plaintiff did not obligate himself to give defendants orders for poles in production, or to do anything else in return for the alleged agreement on part of defendants not to manufacture or sell such poles to anyone except plaintiff. Patton v. Wilson, Tex.Civ.App., 220 S.W.2d 184.

■ In Parrish v. Weber, Tex.Civ.App., 17 S.W.2d 106, an exclusive franchise agreement was before the court, in which the plaintiff was attempting to enforce specific performance. The Court stated: "It will be observed that under the allegations of the petition the contract agreed to be entered into imposed upon the plaintiff no obligation to use the trade-mark and purchase the defendant's products for any definite time. On the contrary, the plaintiff could have discontinued doing so whenever he saw fit. There is thus shown such want of mutuality of obligation as to defeat any right to the injunctive relief sought." So, in the case

here, the defendants had an indefeasible right to manufacture and sell the fishing poles, and the plaintiff had no right to enjoin them; nor was he entitled to damage for breach of the contract in reference thereto, in absence of a binding covenant on his part to be reciprocally bound. Defendants admit that they were willing to manufacture and sell plaintiff's entire output of poles in the event he entered into a valid and binding contract for their purchase. The orders for production were never given. A lack of mutuality, therefore, in the agreement is evident, releasing the defendants from their obligation not to manufacture and sell the fishing pole.

Furthermore, the record evidence shows no loss of profit suffered by plaintiff by reason of defendants' manufacturing and selling the fishing pole to outside parties; or who, if anyone, purchased poles that were manufactured by defendants which plaintiff could or might have sold, or the number of poles he could have sold but for defendants engaging in such enterprise. The only testimony bearing on the issue is that of defendant Boucher who testified that they had sold 7,000 poles in 1947, and in 1949, 17,000 poles. There is no evidence as to the number of these sales that plaintiff could or might have made on his own account; and there is no evidence that the defendants engaged in any transaction as could be characterized "unfair competition,"—palming off their sales as being the property of plaintiff. Such a state of facts clearly brings the issue for damage within the rule set out in Southwest Battery Corporation v. Owen et al., 131 Tex. 423, 115 S.W.2d 1097, and Page et al. v. Hancock, Tex.Civ.App., 200 S.W.2d 421, where, as here, lack of evidence as to the amount of sales and profits to effect legal damages, is fatal to recovery.

We now turn to appellants-defendants' points of error in reference to the action of the trial court in refusing to award damages on their cross-action. The testimony is uncontroverted that because of the injunction order and during the restraining period, from June 13, 1947 and ending on January 21, 1948 when the injunction was dissolved by this Court, the defendants suffered loss of profits which they could and would have earned by the manufacture and sale of the fishing poles. The jury found the loss was in amount of $15,000. The issues of plaintiff's liability and defendants' damage are predicated on the issuance of the temporary writ of injunction, by plaintiff's posting the injunction bond conditioned as required by law, Rule 684, Texas Rules of Civil Procedure, with the defendants William Saltes and Elton D. Saltes as sureties. The bond was in the sum of $10,000.

Profits are recoverable as an item of damage. Southwest Battery Corporation v. Owen, supra. Our Supreme Court in that case announced the rule that loss of profits caused by breach of contract, barring uncertainty as to the fact of legal damage, is recoverable. In Galveston City Ry. Co. v. Miller et al., Tex.Civ.App., 38 S.W. 1132, the rule is announced that profits which the evidence shows would have been earned but for an injunction, are recoverable as damages. So, in the case here, the evidence is that the defendants entered into a contract with a distributing agency with capital stock and surplus of $10,000 to handle the sale of their product; that this concern had two experienced manufacturer's representatives, with an organization operating in the Southern States as stockholders, with whom defendants had contracted for the distribution of their "Fishing Kane"; that during the year 1948, after the temporary injunction was dissolved by this Court, the defendants sold approximately 7,000 poles; and from 1948 up to time of this trial (June 1949) defendants had sold approximately 17,000 poles. Further, the record evidence is that in 1947 the plaintiff, himself, had sold approximately 40,000 poles, and a Mr. Riordan, witness for plaintiff, testified that he had built up his organization to handle the sale of plaintiff's pole from zero to 37,000 poles which he sold in 1947. Thus, basing the cost per pole on manufacturer's accounting principles at $1.6463 for each pole, as given in evidence by the defendants, and the gross-profit sale price of $0.52 per pole as given in evidence by plaintiff, it is conclusive that the defend-

ants suffered damage perforce of the temporary writ of injunction; the only question not determined exactly is the extent or amount of such damage. While the jury assessed defendants' damage at $15,000, yet we are of the opinion that such an amount is excessive; and we may well assume that the trial court would not have rendered judgment for that amount; and, if he had rendered such judgment, this Court would be impelled to reduce the same by remittitur, or reverse the judgment and remand the cause. The defendants are entitled to a judgment on their cross-action against plaintiff and the sureties on his injunction bond, and the trial court should have rendered such judgment as in its opinion should have been rendered within the purview of the jury's verdict. Therefore, the trial court having erred in rendering judgment for the plaintiff, rather than for the defendants on their cross-action, it becomes the duty of this Court to render such judgment as the trial court should have rendered. Hence the cause is reversed and judgment here rendered setting aside the judgment of the trial court, dissolving the injunction, and rendering judgment in favor of the defendants-appellants against the plaintiff Nat Wissman and the sureties, William Saltes and Elton D. Saltes, on his temporary injunction bond in the sum of $5,000, with 6% interest from date of judgment in the court below and all costs of suit, conditioned upon the appellants' filing herein within 10 days agreement to abide our remittance in the sum of $10,000 on the jury's finding of $15,000; otherwise, the cause will be remanded for new trial, in consonance with our opinion herein.

### On Appellants' Remittitur.

PER CURIAM.

The appellants' having filed in response to our suggestion a remittitur of $10,000 to the findings of the jury of $15,000 damages sustained by them as the result of the temporary writ of injunction sued out by appellee; and, in consonance with our opinion in this cause, the judgment of the trial court is reversed and judgment here rendered, as should have been rendered in the

trial court, in favor of appellants' in the sum of $5,000 with legal interest from date of judgment in the court below, and all costs of suit against appellee and his sureties on his injunction bond.

Reversed and rendered.